Cite as 2021 Ark. 26

# SUPREME COURT OF ARKANSAS

No. CR-20-433

| | | |
|---|---|---|
| MARKUS GENTRY | | **Opinion Delivered:** February 11, 2021 |
| | APPELLANT | APPEAL FROM THE CRAIGHEAD COUNTY CIRCUIT COURT [NO. 16JCR-19-54] |
| V. | | |
| STATE OF ARKANSAS | | HONORABLE CINDY THYER, JUDGE |
| | APPELLEE | |
| | | AFFIRMED IN PART; REVERSED AND REMANDED WITH INSTRUCTIONS IN PART. |

**ROBIN F. WYNNE, Associate Justice**

Markus Gentry appeals from his conviction for second-degree murder, for which he was sentenced to life imprisonment plus an additional ten years for a firearm enhancement. For reversal, Gentry raises four points: (1) there was insufficient evidence for Gentry's conviction because there was substantial evidence of justification; (2) the trial court abused its discretion by permitting the State to introduce evidence about Gentry's gang affiliation; (3) the trial court abused its discretion in permitting certain statements attributed to the decedent that were not dying declarations; and (4) the trial court illegally added ten years to Gentry's life sentence. We affirm the conviction for second-degree murder and reverse the firearm-enhancement sentence.

I. *Background*

On New Year's Day in 2019, Markus Gentry fatally shot Lewis Gamble in Gamble's

Jonesboro barbershop. The State alleged that Gentry shot Gamble to avenge Gamble's failure to show respect to the mother of two of Gentry's fellow Piru gang members by refusing to pay for damage to her car. Gentry claimed that he shot Gamble in self-defense.

At trial, James Beeson testified that he was standing across the street from Gamble's barbershop when he saw an African American man exit a gray car and go into the barbershop. He said that he did not see anyone standing outside the shop before the man went in. Beeson said that he heard gunshots and saw the same man exit the shop and get into the same gray car. He also said that he did not hear any arguments before he heard the gunshots.

Richard Woodrum testified that he was in an apartment adjoining the barbershop and heard between seven and ten gunshots coming from the shop. Woodrum testified that he went to the shop several minutes later and found Gamble lying on the floor. He said that he heard Gamble tell a 911 operator that "Mark G." shot him. Woodrum testified that he did not hear any arguments in the shop before he heard the gunshots.

Sergeant Jason Chester of the Jonesboro Police Department testified that when he arrived at the scene, he saw Gamble lying on the floor with two gunshot wounds in his chest. Sergeant Chester testified that Gamble told him that Mark G. shot him and that the two men had not been fighting before he was shot. Sergeant Chester said that Gamble told him that a gun on the floor belonged to Mark G. Footage from Sergeant Chester's body camera was played for the jury.

Detective Shane Fox of the Jonesboro Police Department testified that he went to Gentry's sister's house to talk to Gentry shortly after the shooting. Detective Fox said that Gentry was taken in an ambulance from his sister's house to the hospital for a gunshot wound in his

leg. After Gentry was released from the hospital, Detective Fox interviewed him at the police department. During the interview, which was played for the jury, Gentry said that Gamble let some kids drive his car and that they backed into a car belonging to Jacqueline Jones, whom Gentry called his godmother. According to Gentry, Gamble had agreed to pay Jones for the damages to her car so that she would not call the police. Gentry said that on the day of the shooting he was walking down the street and saw Gamble outside the barbershop. He said that Gamble wanted to talk with him about Jones's car, so he went inside the shop. Gentry said that Gamble lied to Jones to prevent her from calling the police and that Gamble refused to pay for the damage. Gentry said that he got aggressive toward Gamble. Gentry said that Gamble reached for a gun under his shirt and that he got up to leave. He said that he heard gunshots and that Gamble shot him in the back of the leg as he was leaving. Gentry also said that he was a member of the Piru gang.

Jacqueline Jones testified that either Gamble's son or his son's friend was driving Gamble's car when it ran into her car. She said that Gamble had agreed to pay for the damage to her car. Jones also testified that Frank Simpson and Kevin Jones are her sons.

The medical examiner testified that Gamble died of multiple gunshot wounds. The medical examiner also testified that Gamble had no injuries on his body consistent with a fight. The State introduced a Jimenez handgun and a red Michael Jordan hat found at the scene. An examiner from the Arkansas State Crime Laboratory testified that bullets recovered from Gamble's body were fired from the Jimenez handgun. A magazine to a Smith & Wesson handgun was also found at the scene, but the gun was not found. Bullet casings fired from at least two guns were recovered. The State also introduced an audio recording of the 911 call

3

made by Gamble as well as several posts from Gentry's Facebook page showing his affiliation with the Piru gang and association with Frank Simpson and Kevin Jones.

Gentry testified in his own defense. He said that he was walking down the street when he saw Gamble outside the barbershop. Gentry said that he went into the shop and talked to Gamble about the damage to Jones's car. He said that Gamble got hostile and that he saw Gamble pull out something that looked like a gun. He said that he got up to leave when he heard gunfire. Gentry said that he pulled out his gun and returned fire. Gentry testified that he walked over to Gamble and that Gamble continued to fire. He said that he dropped his gun and wrestled with Gamble over Gamble's gun before grabbing it. He said that he left the shop, got into Frank Simpson's car, and went to his sister's house.

The jury convicted Gentry of second-degree murder and employing a firearm as a means of committing second-degree murder. Gentry was sentenced as a habitual offender to life imprisonment plus an additional ten years' imprisonment for a second or subsequent felony with a firearm under Arkansas Code Annotated section 16-90-121 (Repl. 2016). Gentry timely appealed.

II. *Points on Appeal*

A. Justification

Gentry first argues that there was insufficient evidence for his conviction because there was substantial evidence of justification. Gentry contends that he used deadly force against Gamble only because Gamble shot him first.

On appellate review, this court must determine whether there was substantial evidence to support a finding of justification. *Williams v. State*, 325 Ark. 432, 436, 930 S.W.2d 297, 299

4

(1996). Evidence is substantial if it is of sufficient force and character to compel reasonable minds to reach a conclusion and pass beyond suspicion and conjecture. *Airsman v. State*, 2014 Ark. 500, at 5, 451 S.W.3d 565, 569. When a criminal defendant challenges on appeal the sufficiency of the evidence convicting him, we view the evidence in the light most favorable to the State, considering only that evidence that supports the verdict. *Id.*

Justification is not an affirmative defense that must be pleaded but becomes a defense when any evidence tending to support its existence is offered to support it. *Schnarr v. State*, 2018 Ark. 333, at 10, 561 S.W.3d 308, 314–15. The State has the burden of negating the defense once it is put in issue. *Humphrey v. State*, 332 Ark. 398, 409, 966 S.W.2d 213, 218 (1998). Justification is considered an element of the offense, and once raised, it must be disproved by the prosecution beyond a reasonable doubt. Ark. Code Ann. § 5-1-102(5)(C) (Repl. 2013); *Anderson v. State*, 353 Ark. 384, 404, 108 S.W.3d 592, 605 (2003). Justification is a matter of intent and a question of fact for the jury. *Humphrey*, 332 Ark. at 409, 966 S.W.2d at 219. The jury determines not only the credibility of witnesses, but also the weight and value of their testimony. *E.g.*, *Luper v. State*, 2016 Ark. 371, at 6, 501 S.W.3d 812, 817. Moreover, the jury is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *Brunson v. State*, 368 Ark. 313, 317, 245 S.W.3d 132, 136 (2006). The jury may also choose to believe the State's account of the facts rather than the defendant's. *Id.*

A person is justified in using deadly physical force upon another person if the person reasonably believes that the other person is using or about to use unlawful deadly force. Ark.

Code Ann. § 5-2-607(a)(2) (Repl. 2013). But a person may not use deadly force in self-defense if the person knows that he or she can avoid the necessity of using deadly physical force by retreating. Ark. Code Ann. § 5-2-607(b)(1)(A). "One who asserts the defense of justification of a homicide must show not only that the person killed was using deadly physical force, but that he responded with only that force which was necessary and that he could not have avoided the killing." *Williams*, 325 Ark. at 438, 930 S.W.2d at 300.

Viewing the evidence in the light most favorable to the State, we conclude that the State met its burden of negating Gentry's justification defense. Before he died, Gamble told Sergeant Chester that Mark G. shot him and that they had not been fighting before he was shot. Beeson and Woodrum both testified that they had not heard anyone arguing before they heard the gunshots. The medical examiner testified that the autopsy did not show that Gamble sustained injuries consistent with a fight. Also, Gentry did not call for assistance after the shooting but fled from the barbershop. We have held that flight is probative evidence of guilt. *E.g.*, *Gillard v. State*, 366 Ark. 217, 221, 234 S.W.3d 310, 313 (2006). The jury heard Gentry's version of events. The jury heard Gentry say that Gamble shot him in the back of the leg when he got up to leave the shop. The jury heard Gentry say that Gamble continued shooting as Gentry tried to wrestle Gamble's gun away from him. And the jury was free to believe all or part of Gentry's testimony or to believe the State's version of the facts. *See Brunson*, *supra.* In sum, there was substantial evidence to support the verdict.

## B. Gang-Related Evidence

Gentry next argues that the trial court abused its discretion by permitting the State to

introduce evidence about Gentry's gang affiliation. Gentry contends that evidence of his gang affiliation had no independent relevance and should have been excluded under Rules 404(b) and 403.

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. Ark. R. Evid. 404(b). However, such evidence may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *Id.* The admission or rejection of evidence under Rule 404(b) is committed to the sound discretion of the trial court, and this court will not reverse absent a showing of manifest abuse of that discretion. *Phavixay v. State*, 373 Ark. 168, 169–70, 282 S.W.3d 795, 797 (2008). Evidence offered under Rule 404(b) must be independently relevant to make the existence of any fact of consequence more or less probable than it would be without the evidence. *Id.* at 170, 282 S.W.3d at 797. The prior bad act must be independently relevant to the main issue, in that it tends to prove some material point rather than merely proving that the defendant is a criminal. *Id.*

Under Rule 403, evidence otherwise admissible under Rule 404(b) may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice and confusion of the issues. The balancing of probative value against prejudice under Rule 403 is a matter left to the trial court's sound discretion. *Dorsey v. State*, 2020 Ark. 316, at 9, 607 S.W.3d 485, 490. We review a trial court's decisions to admit evidence over a Rule 403 objection under an abuse-of-discretion standard. *Id.*

We have repeatedly held that the State is entitled to prove its case as conclusively as

possible. *Davis v. State*, 368 Ark. 401, 411, 246 S.W.3d 862, 870–71 (2007). The State is entitled to produce evidence showing all circumstances that explain the act, show a motive for acting, or illustrate the accused's state of mind. *Scott v. State*, 325 Ark. 267, 270, 924 S.W.2d 248, 249 (1996). As we have noted,

> It has long been the rule of this court that "where the purpose of evidence is to disclose a motive for killing, anything and everything that might have influenced the commission of the act may, as a rule, be shown." *O'Neal v. State*, 356 Ark. 674, 685, 158 S.W.3d 175, 183 (2004) (quoting *Matthews v. State*, 352 Ark. 166, 173, 99 S.W.3d 403, 408 (2003)). We have said that any circumstance that ties a defendant to the crime or raises a possible motive for the crime is independently relevant and admissible as evidence. *See Matthews v. State*, 352 Ark. 166, 99 S.W.3d 403 (2003).

*Morris v. State*, 358 Ark. 455, 459–60, 193 S.W.3d 243, 247 (2004). This court has specifically recognized that evidence of gang membership may be admissible. In *Scott*, we held that evidence of the defendant's gang membership was relevant to show motive because the victim was a member of a rival gang. 235 Ark. at 271, 924 S.W.2d at 250. We have recognized that expert testimony on the membership, organization, purposes, and conduct of particular street gangs may be admissible when relevant. *Johninson v. State*, 317 Ark. 431, 439, 878 S.W.2d 727, 731 (1994).

Before trial, Gentry moved to exclude evidence that he was affiliated with a gang. The State argued that this evidence was relevant to show identity, motive, and intent, and that it would refute his self-defense claim. The trial court initially excluded evidence of Gentry's gang affiliation because the State had not established a basis for its introduction. But after multiple hearings on the matter, the trial court issued an order on February 13, 2020, ruling that several pieces of evidence were admissible. First, the trial court ruled that a collage of three photographs

posted on Gentry's Facebook page on November 20, 2018, with the words "He Piru and will do you 'Mark G.'" was admissible because the signature "Mark G." on the collage linked Gentry to that name and that the statement associated him with the Piru gang two months before the shooting. The trial court also ruled the probative value outweighed the danger of unfair prejudice. Next, the trial court ruled that a collection of three photographs and a status post—"Every dawg in da Sett you gotta hit head that's a slim to none chance bitch we 'Blood n Piru Nation' Gladiators"—posted on Gentry's Facebook page in the early morning hours of January 1, 2019, were admissible. In its ruling, the trial court remarked that, in two of the photographs, Gentry was holding a gun similar to the one found at the barbershop and was wearing a red hat similar to the one found at the barbershop. The trial court ruled that the photographs were relevant and admissible to prove opportunity, preparation, plan, and Gentry's identity. The trial court also determined that the probative value outweighed the danger of unfair prejudice. As to the Facebook status post, the trial court ruled it went "to the heart of the State's theory that Gentry, active at the time in the Piru gang, shot Gamble to avenge an act of disrespect he had committed toward Jackie Jones." The next piece of evidence was a collage of three photographs posted on Gentry's Facebook page on December 31, 2018, showing Gentry, Frank Simpson, and Kevin Jones posing together. The trial court ruled these photographs were admissible because Gentry's relationship with Simpson and Jones supported the State's theory of the case. The trial court further ruled that the probative value of the collage exceeded any prejudice. In addition, the trial court allowed officer testimony about the importance of this collage.

At trial, the State introduced evidence of Gentry's affiliation with the Piru gang. The State introduced the posts from Gentry's Facebook page. Kevin Jones testified that he, Frank

9

Simpson, and Gentry were once members of the Piru gang and that he referred to his mother, Jacqueline Jones, as "Momma Piru" in a post on Gentry's Facebook page. And in Gentry's custodial statement, he said that he was affiliated with the Piru gang.

Gentry argues that the evidence of his gang affiliation was not independently relevant. He contends that there was no evidence that Gentry's alleged gang affiliation was related to the shooting. There was no evidence that Gamble was involved in a rival gang. And, Gentry argues, there was no evidence that he shot Gamble due to a gang dispute. Rather, Gentry contends that the State alleged that Gentry's motive was financial—to redress Gamble's failure to pay for the damage to Jaqueline Jones's car. Gentry argues that the State introduced the evidence of gang affiliation to show that he acted in conformity with the character of a violent gang member. As an example, Gentry points to the prosecutor's argument in opening statements that "Markus Gentry is a self-proclaimed street solider. He is a self-admitted member of the Piru Street Gang . . . Markus Gentry is a Piru. He is Piru and will do you." Gentry further argues that, even if gang-affiliation evidence was admissible under Rule 404(b), any probative value of this evidence was substantially outweighed by the danger of unfair prejudice and confusion of the issues and should have been excluded under Rule 403.

We first reject the State's contention that Gentry's challenge to the admissibility of the gang-affiliation evidence is not preserved because the trial court did not make specific rulings about whether each piece of evidence was admissible under Rules 403 and 404(b). The trial court's rulings in its February 13, 2020 order are sufficiently specific.

On the merits, the State argues that the Facebook posts at issue were relevant to show identity, motive, and intent and to rebut Gentry's justification claim. We agree and hold that

10

the trial court did not abuse its discretion in admitting gang-affiliation evidence. At trial, the State alleged that Gentry shot Gamble because Gamble disrespected Jacqueline Jones, the mother of his fellow Piru gang members. Evidence of Gentry's gang affiliation was thus relevant to show motive and to rebut Gentry's justification defense. *See Matthews v. State*, 352 Ark. 166, 173, 99 S.W.3d 403, 408 (2003) ("[W]here the purpose of evidence is to disclose a motive for killing, anything and everything that might have influenced the commission of the act may, as a rule, be shown."). The Facebook status post "we Blood n' Piru nation gladiators" and the words "He Piru and will do you" show the alleged motive—retaliation for disrespect to the mother of gang members. The Facebook photograph of Gentry with Kevin Jones and Frank Simpson shows Gentry's relationship with fellow Piru gang members and the sons of Jacqueline Jones. The photographs posted to Gentry's Facebook page less than a day before the shooting showing Gentry holding a gun and wearing a red hat similar to the gun and the hat that were found in the barbershop places him at the scene of the shooting. Gentry's signature of Mark G. in a Facebook post also ties him to the shooting, as Gamble identified Mark G. as the person who shot him. Given the high probative value of this evidence, we conclude that the trial court did not abuse its discretion in determining that its probative value outweighed any potential for unfair prejudice and confusion of the issues.

## C. Dying Declarations

Next, Gentry contends that the trial court abused its discretion by admitting certain hearsay statements attributed to Gamble that were not dying declarations. At issue are video footage from Sergeant Chester's body camera and an audio recording of a 911 call Gamble made after he was shot.

11

Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Ark. R. Evid. 801(c). Hearsay is not admissible except as provided by law or by the rules of evidence. Ark. R. Evid. 802. One exception, when the declarant is unavailable, is a statement made by a declarant while believing that his death was imminent, concerning the cause or circumstances of what he believed to be his impending death. Ark. R. Evid. 804(b)(2). We will not reverse a trial court's ruling on evidentiary matters absent an abuse of discretion. *Grant v. State*, 357 Ark. 91, 93, 161 S.W.3d 785, 786 (2004).

This court has held that dying declarations are deemed inherently trustworthy. *Hammon v. State*, 338 Ark. 733, 736, 2 S.W.3d 50, 52 (1999). "The principal consideration upon which such statements are admitted is that one who realizes that death is inevitable in consequence of the injury inflicted speaks with solemnity and will not resort to fabrication in order to unjustly punish another." *Id.* In *Singleton v. State*, 274 Ark. 126, 129, 623 S.W.2d 180, 181 (1981), a police officer testified that the victim said that the defendant "came into the store, said this is a robbery, grabbed her around the neck, and went to stabbing her" and then said "there's no way I can be all right, you know I'm not going to make it, I've lost too much blood." This court determined that the victim's statements about the defendant's actions were admissible as dying declarations because they were made concerning the cause or circumstances of what the victim believed to be her impending death. *Id.* at 131, 623 S.W.2d at 182.

In the body-camera footage, Sergeant Chester asked Gamble, "Who did this?" and Gamble responded, "Mark G." Gamble also told the officer that a gun found in the barbershop belonged to "[t]he guy that shot me." In response to Sergeant Chester's question, "Were y'all

12

fighting?" Gamble responded, "No." In the 911 call, Woodrum twice asked Gamble, "Who shot you?" and Gamble responded both times that it was Mark G. Likewise, the 911 operator asked Gamble, "Do you know who shot you?" and Gamble responded, "Mark G." In both the body-camera footage and the 911 call, Gamble also stated that "Frank Nitti" was involved.

Before trial, the trial court ruled that Gamble's statements in the body-camera footage that Mark G. had shot him were admissible as dying declarations but excluded officers' statements theorizing about what happened. Likewise, the trial court ruled that Gamble's statements in the 911 call that Mark G. had shot him were admissible. The trial court excluded statements in both the body-camera footage and the 911 call about Frank Nitti's involvement.

During the State's opening statements, defense counsel objected when the prosecutor quoted a conversation between officers and Gamble as captured in the body-camera footage. After hearing arguments about the admissibility of the edited body-camera footage and 911 call, the trial court repeated its ruling that Gamble's responses that Mark G. shot him were admissible as dying declarations and ruled that Gamble's statements in the body-camera footage that the gun was Gentry's and that he and Gentry were not fighting were admissible as dying declarations. The trial court also ruled that the other statements in the 911 call and body-camera footage were admissible because they were not offered for the truth of the matter asserted.

We hold that the trial court did not abuse its discretion in admitting the body-camera footage and the statements in the 911 call. The parties do not dispute that Gamble believed his death was imminent when he spoke to the officers and the 911 dispatcher. Nor do they dispute that Gamble's statements that Mark G. shot him were admissible as dying declarations. Gamble's other statements—that the gun found in the barbershop belonged to Gentry and that he and

13

Gentry were not fighting—concern the cause or circumstances of what he believed to be his impending death. *See Singleton*, *supra.* The other statements in the body-camera footage and 911 call were not hearsay because they were not offered to prove the truth of the matter asserted but merely to add context to Gamble's dying declarations.

## D.  Firearm Enhancement

Finally, Gentry argues that the trial court illegally added ten years to Gentry's life sentence under Arkansas Code Annotated section 16-90-121. An appellant may challenge the imposition of an illegal sentence for the first time on direct appeal, even if he did not raise the argument below. *Ellis v. State*, 2019 Ark. 286, at 3, 585 S.W.3d 661, 663. We view an issue of a void or illegal sentence as one of subject-matter jurisdiction, which we may review whether or not an objection was made in the trial court. *Id*. A sentence is void or illegal when the trial court lacks the authority to impose it. *Id*.

Under Arkansas Code Annotated section 16-90-121, "[a]ny person who is found guilty of or pleads guilty or nolo contendere to a second or subsequent felony involving the use of a firearm shall be sentenced to a minimum term of imprisonment of ten (10) years in the Department of Correction without eligibility of parole or community correction transfer but subject to reduction by meritorious good-time credit." Section 16-90-121 does not impose an additional sentence, but merely precludes the possibility of parole eligibility prior to serving ten years. *Crespo v. State*, 30 Ark. App. 12, 13, 780 S.W.2d 592, 593 (1989).

Gentry's ten-year sentence under section 16-90-121 is illegal. Section 16-90-121 does not authorize a trial court to sentence a defendant to an additional ten years' imprisonment; rather, it mandates that a defendant serve a minimum of ten years in prison before becoming eligible

14

for parole. Gentry's sentence complied with section 16-90-121 because he was sentenced to life imprisonment for second-degree murder. Therefore, we reverse the ten-year firearm-enhancement sentence and remand with instructions to correct the sentencing order.

## III. *Rule 4-3(a) Review*

Because Gentry was sentenced to life imprisonment, the record has been examined for all objections, motions, and requests made by either party that were decided adversely to Gentry in compliance with Arkansas Supreme Court Rule 4-3(a). No prejudicial error has been found.

Affirmed in part; reversed and remanded with instructions in part.

*Lassiter & Cassinelli*, by: *Michael Kiel Kaiser*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Brooke Jackson Gasaway*, Ass't Att'y Gen., for appellee.