Cite as 2025 Ark. App. 444

# ARKANSAS COURT OF APPEALS

DIVISION II
No. CR-24-687

| | | |
|---|---|---|
| BRELYN LONDON | | Opinion Delivered September 24, 2025 |
| | APPELLANT | |
| V. | | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT. FIRST DIVISION |
| STATE OF ARKANSAS | | [NO. 60CR-20-3716] |
| | APPELLEE | |
| | | HONORABLE LEON JOHNSON, JUDGE |
| | | AFFIRMED |

**KENNETH S. HIXSON, Judge**

Appellant Brelyn London appeals after he was convicted by a Pulaski County Circuit Court jury of the lesser included charge of manslaughter while employing a firearm. After his conviction, appellant pled guilty to possession of firearms by certain persons and was sentenced as a habitual offender to serve an aggregate of 540 months' incarceration. On appeal, appellant contends that (1) the circuit court erred in denying his motion for directed verdict because the State failed to present substantial evidence that he committed manslaughter; and (2) the circuit court erred in issuing the "flight" instruction because there was no rational basis for the instruction. We affirm.

I. *Relevant Facts*

Appellant was charged by felony information with capital murder in violation of Arkansas Code Annotated section 5-10-101 (Supp. 2019) and possession of firearms by

certain persons in violation of Arkansas Code Annotated section 5-73-103(c)(1)(B) (Repl. 2016). The State further stated that appellant's sentence should be enhanced because he employed a firearm during the commission of a felony in violation of Arkansas Code Annotated section 16-90-120 (Supp. 2019) and is a habitual offender pursuant to Arkansas Code Annotated section 5-4-501 (Repl. 2013). The circuit court severed the possession-of-firearms-by-certain-persons charge and proceeded with a trial on the capital-murder charge. On February 5, 2024, the day before the three-day jury trial on the capital-murder charge began, the State filed a proposed non-AMI jury instruction, which would allow the jury to consider evidence of appellant's flight as evidence of appellant's guilt. The proposed jury instruction stated, "If you find that the evidence shows that Brelyn London fled to avoid arrest or detection by law enforcement, you may consider that evidence in your deliberations as a circumstance in corroboration of evidence tending to establish the guilt of the defendant."

At trial, it was undisputed that appellant shot Vence Lee on July 20, 2020, in a crowded food-truck parking lot. During opening statements, defense counsel admitted that appellant had shot Mr. Lee; however, defense counsel claimed that appellant did so in self-defense. Mr. Lee was later transported to St. Vincent Hospital for treatment, but he died from his injuries on August 2, 2020.

Detective Chris Henderson testified that he was dispatched to investigate the shooting. When he arrived at St. Vincent Hospital, Mr. Lee was being treated for multiple gunshot wounds. Detective Henderson spoke with Mr. Lee's mother, Sonia Mitchell, who

told Detective Henderson where the shooting had occurred and described appellant's BMW, which led to appellant becoming a suspect. Mr. Lee's sister was not with Ms. Mitchell at that time. Detective Henderson went to the parking lot where the shooting took place and found six spent shell casings at the scene. Eventually, appellant was arrested for the shooting on August 9, 2020.

Meagan Buchert, a crime-scene specialist, testified that she was at the scene when the six .40-caliber shell casings were found. She took several pictures of the scene that were admitted into evidence. Ms. Buchert explained that she also processed appellant's BMW after a search warrant had been obtained. She did not see any bullet holes in appellant's vehicle. There were receipts and other paperwork in the vehicle bearing appellant's name.

Miranda Dollar, another crime-scene specialist, testified that she processed and photographed a Kia Sorento. There were three apparent bullet strikes on the front of the car. She saw no evidence that a gun had been fired from inside the car. On cross-examination, Ms. Dollar stated that she first had access to the vehicle on August 3, 2020.

Sharne Lee, Mr. Lee's sister, testified that she was with her brother when he was shot. She explained that she had driven herself and her brother to Kool's BBQ food truck in a rented Kia Sorento on July 20, 2020. She backed the vehicle into a parking spot and got out to get food. Mr. Lee waited inside the vehicle. When she came back to the vehicle, she was blocked in by appellant's BMW. She asked him to let her out, but he responded, "Y'all gonna wait, f . . . y'all, y'all gonna wait." Appellant remained inside his vehicle in the driver's seat during the entire incident, with the driver's seat facing the hood of her vehicle.

3

Thereafter, Mr. Lee got out of the Kia Sorento from the passenger side, walked to appellant's vehicle, and asked appellant to move. Ms. Lee said that appellant shot her brother "when [he] turned around." She thought appellant fired five or six shots. She denied that Mr. Lee had a gun and said that Mr. Lee "had his back turned." Ms. Lee testified that they got back inside the vehicle, she took her brother to the hospital, she called her mother, and she then went to pick her mother up. She admitted that she did not immediately meet with law enforcement because she was "going through trauma," but she later spoke to law enforcement at her home.

On cross-examination, Ms. Lee repeated the details surrounding the shooting. She stated that the parking lot was crowded and that there were approximately twenty to twenty-five people there. She stated that after appellant told her she needed to wait, she went back and sat inside her vehicle. She clarified that this was when Mr. Lee got out of the car to ask appellant to leave. Ms. Lee admitted that she did not hear exactly what her brother had said but that she "heard some words." At that point, she encouraged Mr. Lee to come back to the car. However, appellant began shooting when her brother turned around and started walking back to the vehicle. Ms. Lee admitted that she did not talk to law enforcement for approximately two weeks because she "was grieving." She further admitted that she did not see appellant's gun but heard the gunshots. She repeatedly denied that Mr. Lee had a gun when he was shot. After Mr. Lee was shot, she got out of the car, and the two of them ran behind the bushes. Ms. Lee stated that she has posttraumatic stress disorder. After appellant

4

left in the BMW, she was able to get Mr. Lee into the Kia Sorento, and she took him to the hospital.

On redirect, Ms. Lee again denied that Mr. Lee had a gun when he was shot or that she hid a gun from law enforcement.

Sonia Mitchell, the victim's and Ms. Lee's mother, testified that Ms. Lee called her after her son was shot. She thought that Ms. Lee was playing a joke on her. She said that Ms. Lee was very upset on the phone. Ms. Lee drove to pick her up, and Ms. Mitchell noticed that there was blood everywhere in the passenger seat. Ms. Lee told her that appellant was the one who shot her son. Ms. Mitchell denied seeing either of her children with a gun that day. She spoke with law enforcement at the hospital, but she admitted that she did not let law enforcement talk to Ms. Lee because the officer would not let her to see her son.

Dr. Stephen Erickson testified that he is the deputy chief medical examiner at the Arkansas State Crime Laboratory and that he conducted the autopsy of Mr. Lee on August 4, 2020. He explained that Mr. Lee died of sepsis and multi-organ failure due to multiple gunshot wounds. He described four gunshot wounds: one that grazed the victim's chin, a second that was at the victim's collarbone, a third to the victim's elbow, and a fourth to the victim's abdomen. On cross-examination, Dr. Erickson agreed that there were no gunshot entrance or exit wounds on Mr. Lee's back. He further agreed that the wounds were not consistent with the victim walking away with his back to the shooter. Instead, he said that they were "more consistent with someone standing to his right side. . . . turning to [the shooter] or turning away from [the shooter]." On redirect, Dr. Erickson demonstrated how

the victim must have turned to be consistent with the location of the wounds but added, "[Y]ou're freezing the body in a moment of time where there's a lot of dynamic movements. There's at least four bullets being fired. So trying to reconstruct that from what I saw that day can be difficult." On further cross-examination, Dr. Erickson denied that the gunshot wounds were consistent with the victim's walking toward the shooter. He said that "you have to be turned around facing [the shooter] sideways, basically."

After the State presented its case-in-chief, defense counsel moved for directed verdict. Regarding the lesser-included charge of manslaughter, counsel argued that there was insufficient evidence that appellant caused Mr. Lee's death "consciously disregarding the risk[.]" He further argued that he had proved beyond a reasonable doubt that appellant acted in self-defense. He explained that appellant reasonably believed that "somebody was about to use unlawful deadly force, specifically this alleged victim and that he only used reasonable force as was necessary; that there was no – there's not been any evidence that he could have left the scene or got away with complete safety[.]" The circuit court denied appellant's motion.

The defense recalled Detective Henderson. Detective Henderson testified that he did not know that Ms. Lee was in the parking lot when he was at the hospital talking with Ms. Mitchell. He explained that he had waited for Ms. Lee to come back to the hospital to talk with him, but she never did. He further explained that he left his number with Ms. Mitchell for Ms. Lee to call him. However, Detective Henderson never received a phone call but was present for an interview with Ms. Lee approximately two weeks after the shooting. He agreed

6

that he did not let Ms. Mitchell see her son at the hospital because he was receiving medical treatment at that time.

Rodd McClendon testified that he had been convicted of robbery and was on parole. He explained that he was with appellant on the day of the shooting. The two had been looking at properties, and appellant decided to stop at the food truck. Mr. McClendon stated that the parking lot was crowded and that there was nowhere to park. He testified that he was scrolling through his phone in the passenger seat when he heard a "commotion going on." When he looked up, he saw a man with a gun standing at the driver's-side window talking to appellant. He recalled that the man told them "to move around before I make y'all move around." Mr. McClendon got out of the car and then started running after he heard shots fired. Later, appellant told him to get into the vehicle; they left, and appellant took him home. Mr. McClendon denied knowing that anyone had been shot until a week or two later when he reported the shooting to law enforcement. He could not remember if appellant told him to go to law enforcement. He denied seeing the shooting, because he got out of the vehicle. When he first reported the incident, Mr. McClendon told law enforcement that he did not want to be involved and did not want to make an official statement.

Appellant testified that he had been previously convicted of a felony, including theft. He admitted that he was still on probation for fleeing and that he shot Mr. Lee. However, he claimed that he shot in self-defense. He explained that Mr. Lee

7

[s]topped and ask me ~ well, he demanded me to like move my car. So I'm like, all right, you know what I'm saying, I want your spot anyway. So I guess he didn't understand what I said. So he got to mouthing off. I got to mouthing off. He tried to like almost ~ like he was about to walk off and turned around with a gun. I heard him grabbed his and just starts to ~ just [waving] and just starts shooting.

Appellant denied making any threats, but he could not remember exactly what was said at the time. He claimed that he grabbed his gun and "started shooting" only after Mr. Lee turned around and aimed the gun at him. Appellant further claimed that he did not think he shot Mr. Lee and thought his "distraction worked." He admitted that he did not go to law enforcement because he did not think he had hit anyone.

On cross-examination, appellant admitted that he left after the shooting and traveled to Atlanta. He claimed that he returned and turned himself in once he learned that there was an arrest warrant for murder. He said that he sold the gun he used and did not know why he did not keep it for evidence.

In rebuttal, the State called two additional witnesses. Investigator Tim Lassiter testified that he met with Mr. McClendon on January 30, 2024. The interview was not recorded. However, he recalled that during the interview, Mr. McClendon said that appellant had the opportunity to drive away instead of shooting Mr. Lee.

Detective Terry McDaniel testified that Mr. McClendon came to the police station on August 10, 2020. At that time, Mr. McClendon stated that "he was unsure if he wanted to provide a statement due to a fear of retaliation. Then he declined to provide a formal statement regarding the case." Mr. McClendon did not say anything about appellant acting in self-defense at that time.

8

At the close of all the evidence, appellant renewed his motions for directed verdict, which the circuit court denied. During the discussion about jury instructions, defense counsel objected to the State's proposed instruction about appellant's flight. The circuit court overruled the objection and read the following instruction to the jury: "If you find him ~ find that evidence shows that Brelyn London fled to avoid arrest or detection by law enforcement, you may consider that evidence in your deliberations as the circumstances and corroboration of evidence tending to establish the guilt of the Defendant."

The jury found appellant guilty of the lesser-included offense of manslaughter and that he employed a firearm as a means of committing manslaughter. After his conviction, appellant pled guilty to possession of firearms by certain persons and was sentenced as a habitual offender to serve an aggregate of 540 months' incarceration. This appeal followed.

## II. *Sufficiency of the Evidence*

We treat a motion for a directed verdict as a challenge to the sufficiency of the evidence. *Armstrong v. State*, 2020 Ark. 309, 607 S.W.3d 491. In reviewing a sufficiency challenge, we assess the evidence in the light most favorable to the State and consider only the evidence that supports the verdict. *Id.* We will affirm a judgment of conviction if substantial evidence exists to support it. *Id.* Substantial evidence is evidence that is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other without resorting to speculation or conjecture. *Id.* Circumstantial evidence may provide a basis to support a conviction, but it must be consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. *Collins v. State*, 2021 Ark. 35,

9

617 S.W.3d 701. Whether the evidence excludes every other hypothesis is left to the jury to decide. *Id.* Further, the credibility of witnesses is an issue for the jury, not the court; the trier of fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *Armstrong, supra.*

This court has noted that a criminal defendant's intent or state of mind is seldom apparent. *Benton v. State*, 2020 Ark. App. 223, 599 S.W.3d 353. One's intent or purpose, being a state of mind, can seldom be positively known to others, so it ordinarily cannot be shown by direct evidence but may be inferred from the facts and circumstances. *Id.* Because intent cannot be proved by direct evidence, the fact-finder is allowed to draw on common knowledge and experience to infer it from the circumstances. *Id.* Because of the difficulty in ascertaining a defendant's intent or state of mind, a presumption exists that a person intends the natural and probable consequences of his or her acts. *Id.*

## A. Recklessness

On appeal, appellant concedes that there is no dispute that he caused Mr. Lee's death. Instead, he first argues that the State failed to introduce any evidence that he *recklessly* caused Mr. Lee's death. We disagree.

A person commits manslaughter when he recklessly causes the death of another person. Ark. Code Ann. § 5-10-104(3) (Supp. 2019). A person acts recklessly with respect to "attendant circumstances or a result of his or her conduct when the person consciously disregards a substantial and unjustifiable risk that the attendant circumstances exist or the result will occur." Ark. Code Ann. § 5-2-202(3)(A) (Repl. 2013). The risk must be of a

10

nature and degree that its disregard constitutes a gross deviation from the standard of care a reasonable person would have observed in his situation. Ark. Code Ann. § 5-2-202(3)(B).

We agree with the State that it presented substantial evidence of appellant's reckless mens rea. *See, e.g., Oliver v. State*, 2016 Ark. App. 332, at 6, 498 S.W.3d 320, 324 (holding that firing a firearm into the air in a crowded area with other drivers present and businesses nearby was substantial evidence of recklessness). Here, the jury heard testimony that appellant fired at Mr. Lee six times in a crowded food-truck parking lot. Viewing all evidence of record in the light most favorable to the State, we hold that there was substantial evidence from which the jury could have found appellant guilty of manslaughter and that his conduct was reckless.

## B. Justification

Because appellant claimed that he acted in self-defense, the jury here was also instructed on justification pursuant to Arkansas Code Annotated section 5-2-607(a) (Supp. 2019). We also employ the substantial-evidence standard of review when reviewing the sufficiency of the State's negation of a justification defense. *Gentry v. State*, 2021 Ark. 26; *Gillard v. State*, 2019 Ark. App. 438, 586 S.W.3d 703. Justification is not an affirmative defense that must be pleaded but becomes a defense when any evidence tending to support its existence is offered to support it. *Schnarr v. State*, 2018 Ark. 333, 561 S.W.3d 308. The State has the burden of negating the defense once it is put in issue. *Humphrey v. State*, 332 Ark. 398, 966 S.W.2d 213 (1998). Justification is considered an element of the offense, and once raised, it must be disproved by the prosecution beyond a reasonable doubt. Ark. Code

Ann. § 5-1-102(5)(C) (Repl. 2013); *Anderson v. State*, 353 Ark. 384, 108 S.W.3d 592 (2003). Justification is a matter of intent and a question of fact for the jury. *Humphrey, supra.* The jury determines not only the credibility of witnesses but also the weight and value of their testimony. *Gentry, supra.* Moreover, the jury is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *Id.* The jury may also choose to believe the State's account of the facts rather than the defendant's. *Id.*

When appellant committed the offense on July 20, 2020, the self-defense statute provided the following in pertinent part:

(a) A person is justified in using deadly physical force upon another person if the person reasonably believes that the other person is:

(1) Committing or about to commit a felony involving force or violence;

(2) Using or about to use unlawful deadly physical force; or

(3) Imminently endangering the person's life or imminently about to victimize the person as described in § 9-15-103 from the continuation of a pattern of domestic abuse.

(b) A person may not use deadly physical force in self-defense if the person knows that he or she can avoid the necessity of using deadly physical force:

(1)(A) By retreating.

(B) However, a person is not required to retreat if the person is:

(i) Unable to retreat with complete safety;

(ii) In the person's dwelling or on the curtilage surrounding the person's dwelling and was not the original aggressor; or

12

(iii) A law enforcement officer or a person assisting at the direction of a law enforcement officer; or

(2) With complete safety by surrendering possession of property to a person claiming a lawful right to possession of the property.

Ark. Code Ann. § 5-2-607(a)–(b) (Supp. 2019).[1]

Appellant argues that the State failed to present "substantial evidence to negate his claim of self-defense beyond a reasonable doubt." He explains that two witnesses testified that Mr. Lee was the initial aggressor and that he testified that he fired only after Mr. Lee brandished a firearm and pointed it at him. Although appellant acknowledges that Mr. Lee's sister testified that appellant shot Mr. Lee in the back, appellant argues that her testimony did not constitute substantial evidence because her testimony was disproved by the autopsy. He further argues that Ms. Lee lacked credibility because she intentionally evaded law enforcement after the shooting. We disagree.

Here, Ms. Lee repeatedly denied that her brother had a gun when he was shot. Instead, she testified that she was sitting in her vehicle and heard the gunshots. Dr. Erickson testified that although none of the shots entered or exited the victim's back, the wounds were consistent with Mr. Lee being "sideways, basically." After Mr. Lee was shot, appellant fled the scene, disposed of the gun, and traveled to Atlanta. Our appellate courts have consistently held that flight is probative evidence of guilt. *Severance v. State*, 2024 Ark. App. 87, 684 S.W.3d 610. Although appellant claimed he shot in self-defense and that he left

---

[1]We note that appellant mistakenly cites an amended version of the self-defense statute that was not in effect when he committed the offense.

because he did not know he had shot Mr. Lee, the jury was free to believe all or part of appellant's explanation or to believe the State's version of the facts. *Id.*; *Hines v. State*, 2024 Ark. App. 523, 699 S.W.3d 846. Thus, viewing the evidence in the light most favorable to the State and considering the deference afforded to the jury to determine the weight and credibility of the evidence as well as to resolve conflicts in the evidence, we hold that there was sufficient evidence presented by the State to negate appellant's justification defense and affirm.

### III. *Jury Instruction*

Last, appellant argues that the circuit court erred in issuing the "flight" instruction because there was no rational basis for the instruction. Appellant concedes that the instruction was a correct statement of law. However, he argues that the circuit court should not have given the instruction because there "was no evidence that [he] departed from the scene of the shooting, or the State of Arkansas afterward, with the purpose of evading an arrest or detection by law enforcement." He explains that he left only "because he was in fear for his safety, and because he did not believe it was necessary, given that he was unaware that Lee had been shot." He contends that we must therefore reverse and remand for a new trial. We disagree.

A party is entitled to a jury instruction when it is a correct statement of the law and when there is some basis in the evidence to support giving the instruction. *Smith v. State*, 2025 Ark. 26, 708 S.W.3d 336. A nonmodel jury instruction should be given only when the model instructions do not correctly state the law or there is no model instruction on the

14

subject. *Id.* We will not reverse a circuit court's ruling on whether to submit a jury instruction absent an abuse of discretion. *Id.*

Here, appellant testified that he left the scene and traveled to Atlanta after he fired six shots at Mr. Lee. The circuit court read the following instruction to the jury: "If you find him ~ find that evidence shows that Brelyn London fled to avoid arrest or detection by law enforcement, you may consider that evidence in your deliberations as the circumstances and corroboration of evidence tending to establish the guilt of the Defendant." The supreme court recently addressed a similar nonmodel jury instruction in *Smith*, *supra*.

In *Smith*, the jury was instructed that "[e]vidence that the defendant fled to avoid arrest or detection by the police may be considered by you in your deliberations as circumstantial evidence corroborative of the guilt of the defendant." *Smith*, 2025 Ark. 26, at 20, 708 S.W.3d at 350. Similar to the facts of the present case, Smith offered an excuse that his flight was not to avoid arrest but that he went to Kansas to visit his girlfriend. On appeal, he argued, as appellant does here, that the circuit court erred in giving a nonmodel jury instruction. The supreme court disagreed and provided the following analysis:

> Although Smith claims that he was in Kansas to visit his girlfriend rather than to avoid arrest, the instruction did not require that the jury reach any particular conclusion from the evidence that was presented; rather, the instruction merely stated the evidence "may" be considered as corroborative of Smith's guilt. Nor was the jury instruction an improper comment on the evidence, as argued by Smith, given its discretionary language.

*Id.* Just as the supreme court held there was no abuse of discretion in *Smith*, we must do the same under the facts of this case. Accordingly, we affirm.

Affirmed.

ABRAMSON and THYER, JJ., agree.

*James Law Firm*, by: *William O. "Bill" James, Jr.*, and *Drew Curtis*, for appellant.

*Tim Griffin*, Att'y Gen., by: *Christian Harris*, Sr. Ass't Att'y Gen.; and *Mallory Wood*, Law Student Admitted to Practice Pursuant to Rule XV of the Rules Governing Admission to the Bar of the Supreme Court under the Supervision of *Jason Michael Johnson*, Deputy Att'y Gen., for appellee.