Cite as 2024 Ark. App. 87

# ARKANSAS COURT OF APPEALS

DIVISION IV
No. CR-23-188

| | | |
|---|---|---|
| SCOTT SEVERANCE | APPELLANT | Opinion Delivered February 7, 2024 |
| V. | | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, SEVENTH DIVISION [NO. 60CR-21-634] |
| STATE OF ARKANSAS | APPELLEE | HONORABLE KAREN D. WHATLEY, JUDGE |
| | | AFFIRMED |

**KENNETH S. HIXSON, Judge**

Appellant Scott Severance appeals after he was convicted by a Pulaski County Circuit Court jury of second-degree murder and employing a firearm during the commission of the offense. He was sentenced as a habitual offender to serve an aggregate of six hundred months' incarceration. On appeal, appellant challenges (1) the sufficiency of the evidence supporting his conviction; (2) the circuit court's refusal to admit Lindsey Krasovic's out-of-court statements made to law enforcement; and (3) the circuit court's sustaining the State's *Batson* challenge as to one juror. We affirm.

I. *Relevant Facts*

Appellant, a Caucasian man,[1] was charged by felony information with murder in the first degree in violation of Arkansas Code Annotated section 5-10-102 (Supp. 2019), a Class Y felony.[2] The State alleged that appellant's sentence should be enhanced pursuant to Arkansas Code Annotated section 16-90-120 (Repl. 2016) for having employed a firearm as a means of committing the felony offense. The State further sought an enhanced sentence under the habitual-offender statute, Arkansas Code Annotated section 5-4-501(a) (Supp. 2019). The information alleged that appellant purposely caused the death of Brandon Simpson, an African American male.[3] Appellant claimed the defense of justification and specifically argued that he acted in self-defense. Although a jury trial was first held on March 8, 2022, that trial resulted in a mistrial. As such, appellant's second jury trial was held on August 16–17, 2022, wherein appellant was convicted as set forth above.

The State called nine witnesses. The victim's wife, Shada Simpson, testified that on December 26, 2020, she and her husband, the victim Brandon Simpson, were on the way to a store. Before arriving at the store, they stopped at appellant's residence. Ms. Simpson did not know why they were stopping and waited in the vehicle while the victim, Brandon, went

---

[1]The opinion notes that the appellant was a "Caucasian man" due to the subsequent discussion of appellant's *Batson* challenge.

[2]Although appellant was additionally charged with possession of a firearm by certain persons, the State subsequently nolle prossed that charge.

[3]The opinion notes that the victim was an "African American" due to the subsequent discussion of appellant's *Batson* challenge.

into appellant's residence. Ms. Simpson explained that she did not know appellant very well and that she had met appellant and his girlfriend, Lindsey Krasovic, only once. When they arrived at the residence, there were a man and woman "hanging outside." Brandon left the vehicle running and went inside. Brandon was in the appellant's residence for approximately five minutes. Ms. Simpson testified she looked up and saw a window in the house vibrate; and the man and woman, who were still outside, ran away down the street. Ms. Simpson stated that she got out of the truck and saw her husband come out of the front door. Her husband slumped over the railing and said "he shot me. I'm dying." When Ms. Simpson approached the porch, Brandon stopped her and said "he had a gun" and told her to "run and go get help[.]" Ms. Simpson had her phone in her hand and ran up the hill toward their apartment and called 911. A police officer responded to the call and met Ms. Simpson at the top of the hill at her apartment. Ms. Simpson got into the officer's car, and they drove down to appellant's residence. Ms. Simpson estimated that approximately five minutes had elapsed since the shooting.

When they arrived at appellant's residence, Brandon was no longer lying on the porch. The police knocked on door several times but there was no answer. Ms. Simpson stated there were around ten officers at the scene. She called Brandon's phone, but there was no answer. The police searched all around the exterior of the house and eventually removed Ms. Simpson from the scene and took her to a position up the hill and across from a school. Several minutes elapsed and the police officers subsequently returned to Ms. Simpson and advised her that Brandon was deceased.

Officer Coleman Dillon testified that he received a dispatch advising that a woman had called 911 and reported that her husband had been shot on Mara Lynn Drive in a red Tahoe.  Officer Dillon was only two and a half blocks from the scene when he received the dispatch.  He arrived on Mara Lynn Drive and located a red Tahoe.  The Tahoe was *not* running.  Officer Dillon searched the area, but he did not see anybody in the Tahoe or any indication of a shooting.  Officer Dillon called dispatch and had them call back the woman who had reported the shooting.  Dispatch then called Officer Dillon back and told him that the woman was located at 1141 Mason Drive, about one block away.  Officer Dillon testified that he left the scene and found Ms. Simpson at her apartment.  They got into his squad car and returned to the scene of the shooting.  Officer Dillon stated that he knocked and banged on the door fairly loudly, but no one would answer the door.  There were lights on; the shades were pulled down; and he heard music coming from inside the residence.

Additional police officers had arrived on the scene.  Officer Dillon was still attempting to locate the victim.  He called dispatch and requested that they contact local hospitals to see if anyone had been admitted with gunshot wounds.  They also were attempting to ping Brandon's phone to locate him.  The pinging indicated that the phone was in the vicinity of the scene, but it did not produce a precise location.

While on scene, Officer Dillon was put in touch with Ashona Givens.  He testified that Ms. Givens relayed that she had seen a male outside yelling that he had been shot and saw a Caucasian male come out and pull him back inside the residence.

Approximately two hours elapsed from the time of Ms. Simpson's call, and it was at that point law enforcement decided to breach appellant's residence. While clearing the residence, officers located Brandon dead in the southeast room of the house. He had "a single wound on the front." Lindsey Krasovic was found in the upstairs bathroom taking a shower. Appellant was not located.

Miranda Dollar, a crime-scene specialist with the Little Rock Police Department crime-scene search unit, testified that the keys to the red Tahoe were found inside the residence on the coffee table. She also testified that there was a package in the living room addressed to appellant's daughter, Bailey Severance, in Pueblo, Colorado. The return address said "Dad" and listed an address in Pueblo, Colorado. A .380-caliber pistol was found underneath the sink of the bathroom inside a box of OxyClean. A .380 shell casing was located in the living room near the front door.

Ashona Givens testified that she lived with her mother on Mara Lynn Road. On the night of the shooting, as she was leaving her apartment, she saw a man yelling for help across the street from her residence. The man stumbled out of the door and fell. After the man collapsed, she saw a woman open the door, look out, and shut the door. Later, she opened it again, but this time there was a guy with her. Ms. Givens explained that she saw the guy pick up the collapsed man "by his underarms and [drag] him in the house like he was trash." They closed the door and then the woman opened the door again, looked out, and then closed the door. Ms. Givens admitted that she left and did not call law enforcement. However, she explained that she did call her mother who had lived with her. Later, Ms.

Givens received a phone call from her aunt with law enforcement on the other line. It was at that point that she told law enforcement what she had seen.

The police were unable to locate the appellant, so they set up surveillance of the appellant's residence. Detective Jason Harris testified that he arrested appellant three days later at the residence on December 29, 2020, and transported him to the 12th Street station for an interview with Detective Temple.

Detective Eric Temple testified that after he advised appellant of his *Miranda* rights, appellant chose to waive those rights and gave a statement. Detective Temple and Detective Jackman were present and asked appellant questions during the interview. The recorded interview was played for the jury. During the interview, appellant said he had lived at his apartment for about a month and that he had lived in Arkansas for a total of two months. He stated that he knew Brandon for about a month, that Brandon "stop[ped] by all the time," and that he had agreed to buy a speaker from Brandon. Appellant claimed he called Brandon "Perp," and Brandon called him "Sergio." Appellant said that he had loaned Brandon money that Brandon still owed him.

Appellant stated that on the day Brandon was killed, he was away from home when he got a call from his fiancée, Ms. Krasovic.[4] She told him that while she was taking out the trash, "a Black man just tried to break in the house." Appellant returned home, and soon after, Brandon knocked on the door, saying he had stopped by a little earlier. Appellant and

---

[4]We note that Ms. Krasovic is referred to at various times as appellant's girlfriend, fiancée, or wife in the record.

Brandon went to Brandon's home to get the speaker, and Brandon said he would stop by again in about fifteen minutes to pick up the money for it.

When Brandon later approached appellant's apartment, Ms. Krasovic told appellant that Brandon was wearing the same clothes as the man who had tried to break into the house. Appellant said that he and Ms. Krasovic were in the kitchen, and he had friends (a Caucasian couple whose names he did not know, except that the man was named Dustin) outside on the porch at the time. Appellant said that Brandon opened the door without knocking and entered the apartment. Appellant told him to stop and ordered him to leave.

Appellant said Brandon started walking toward them and pulled a gun from the "front side-ish" part of his waist. Appellant said Brandon never pointed the gun at him but that he grabbed Brandon as Brandon raised the gun. Appellant said that the two of them struggled, and the gun went off, striking Brandon. Brandon dropped and began to flail around, and appellant told him to go to the hospital. Appellant said that when he opened the door, Brandon "flop[ped]" out and "just lay there." He explained that it was at that point he and Ms. Krasovic pulled Brandon back inside the apartment "and ma[d]e sure he's all right." He said Brandon was not bleeding.

When asked the color of the gun Brandon carried, appellant said, "Do I know what color that gun that was at the scene was?" The detective replied, "No, the one that Perp carr[ied.]" Appellant responded, "I didn't even know he carried a gun" and "from what I understood he said he got his gun stolen." After further questioning about the gun,

appellant said Brandon "would say anything" and that another "dude" had a gun stolen the week before and that they thought Brandon had something to do with it.

Appellant said that he did not call the police to report the incident, but he admitted that he probably should have called it in after he pulled Brandon back into the apartment. When appellant was asked, "At any time did police come knock on the door from your knowledge," appellant replied that was all he had to say at that time. After further questioning, appellant said that after pulling Brandon back into the house, he looked at the .380 silver and black gun on the floor of the living room. Appellant said that he thought Brandon had a flesh wound. When asked if they left Brandon in the living room after pulling him back inside, appellant said that Brandon was up and walking around, they gave him some water, and then Brandon wanted to go crawl into the bedroom by the carpet, where appellant sat with him. Appellant told the detectives he thought that Brandon was shot in his ribs and that Brandon was talking to him until he left. When asked where he went, appellant refused to answer. He also refused to tell the detectives how long Brandon was breathing or what happened to the gun.

Appellant admitted that he was sure his fingerprints would be on the gun because he touched it. When asked at what point he touched the gun, appellant responded, "I told you that I went to grab it and then I also picked it up to look at it" to see what caliber it was. Appellant denied hiding the gun anywhere. The detectives asked appellant, "What's the last thing Brandon said to you? Do you remember?" Appellant laughed as he answered that

Brandon asked him, "Why'd you do me like this?" Appellant described the experience as "traumatic" in the interview.

After the video of appellant's statement to the police concluded, on cross-examination, Detective Temple admitted that law enforcement had obtained a search warrant for appellant's residence and that it was "fully searched." Temple admitted that no additional ammunition for the gun or ownership documents were found in appellant's residence. Detective Temple testified that he did not search Brandon's residence and explained that he "didn't have any reason to get in there and search it."

Jennifer Floyd with the Arkansas State Crime Laboratory testified that in her opinion, the spent shell casing that was found was fired by the pistol that had been located underneath the sink. She further explained that she did not think that two people fighting over a gun would cause a gun to fire. She explained that there was nothing wrong with the gun and that it would "shoot . . . [a]s many times as you pull the trigger."

First Cash and Pawn is located in Pueblo, Colorado. Mike Tedesco testified as the keeper of the records for First Cash and Pawn. Mr. Tedesco explained that his records showed that the recovered pistol had been purchased on August 18, 2016, by a person named Annette Salazar.

Dr. Jennifer Forsyth, the medical examiner who examined Brandon's body, confirmed that he was killed by a gunshot wound to his torso and that the manner of death was homicide. She recovered the bullet from inside his body cavity. She explained that the trajectory of the bullet was from left to right, downward, and toward the back. The bullet

went through his eighth left rib, his liver, his stomach, the head of his pancreas, his right renal artery, and his right kidney before coming to rest under the skin on the right side of his body. Dr. Forsyth said that there was abundant internal bleeding. Finally, she testified that Brandon sustained "significant injuries." However, she explained that had he been given appropriate immediate medical treatment, Brandon potentially could have survived because it was "not an invariably fatal wound."

Finally, the jury was read a stipulation that had been agreed upon by the parties. The jury was told, "The parties agree that on February 8, 2019, the defendant, while in Missouri, reported his address as 3 Villa Place in Pueblo, Colorado."

After the State rested, appellant moved for a directed verdict, arguing in relevant part that the State had failed to negate his justification defense. The circuit court denied the motion, and appellant then rested without introducing any further evidence. Appellant renewed his motion for directed verdict, which the circuit court also denied.

The jury found appellant guilty of the lesser included offense of second-degree murder and found that he employed a firearm during the commission of the offense. He was sentenced as a habitual offender to serve an aggregate of six hundred months' incarceration. This appeal followed.

## II. *Sufficiency of the Evidence*

We treat a motion for a directed verdict as a challenge to the sufficiency of the evidence. *Armstrong v. State*, 2020 Ark. 309, 607 S.W.3d 491. In reviewing a sufficiency challenge, we assess the evidence in the light most favorable to the State and consider only

the evidence that supports the verdict. *Id.* We will affirm a judgment of conviction if substantial evidence exists to support it. *Id.* Substantial evidence is evidence that is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other without resorting to speculation or conjecture. *Id.* Circumstantial evidence may provide a basis to support a conviction, but it must be consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. *Collins v. State*, 2021 Ark. 35, 617 S.W.3d 701. Whether the evidence excludes every other hypothesis is left to the jury to decide. *Id.* Further, the credibility of witnesses is an issue for the jury, not the court; the trier of fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *Armstrong, supra.*

This court has noted that a criminal defendant's intent or state of mind is seldom apparent. *Benton v. State*, 2020 Ark. App. 223, 599 S.W.3d 353. One's intent or purpose, being a state of mind, can seldom be positively known to others, so it ordinarily cannot be shown by direct evidence but may be inferred from the facts and circumstances. *Id.* Because intent cannot be proved by direct evidence, the fact-finder is allowed to draw on common knowledge and experience to infer it from the circumstances. *Id.* Because of the difficulty in ascertaining a defendant's intent or state of mind, a presumption exists that a person intends the natural and probable consequences of his or her acts. *Id.*

In relevant part, a person commits the crime of second-degree murder if he knowingly causes the death of another person under circumstances manifesting extreme indifference to the value of human life. Ark. Code Ann. § 5-10-103(a)(1) (Repl. 2013). A person acts

knowingly with respect to (1) "[t]he person's conduct or the attendant circumstances when he or she is aware that his or her conduct is of that nature or that the attendant circumstances exist;" or (2) "[a] result of the person's conduct when he or she is aware that it is practically certain that his or her conduct will cause the result." Ark. Code Ann. § 5-2-202(2) (Repl. 2013).

Because appellant claimed that he acted in self-defense, the jury here was also instructed on justification pursuant to Arkansas Code Annotated section 5-2-607(a) (Supp. 2019). We also employ the substantial-evidence standard of review when reviewing the sufficiency of the State's negation of a justification defense. *Gentry v. State*, 2021 Ark. 26; *Gillard v. State*, 2019 Ark. App. 438, 586 S.W.3d 703. Justification is not an affirmative defense that must be pleaded but becomes a defense when any evidence tending to support its existence is offered to support it. *Schnarr v. State*, 2018 Ark. 333, 561 S.W.3d 308. The State has the burden of negating the defense once it is put in issue. *Humphrey v. State*, 332 Ark. 398, 966 S.W.2d 213 (1998). Justification is considered an element of the offense, and once raised, it must be disproved by the prosecution beyond a reasonable doubt. Ark. Code Ann. § 5-1-102(5)(C); *Anderson v. State*, 353 Ark. 384, 108 S.W.3d 592 (2003). Justification is a matter of intent and a question of fact for the jury. *Humphrey, supra*. The jury determines not only the credibility of witnesses, but also the weight and value of their testimony. *Gentry, supra*. Moreover, the jury is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *Id.* The jury may also choose to believe the State's account of the facts rather than the defendant's. *Id.*

A person is justified in using deadly physical force upon another person if the person reasonably believes that the other person is committing or about to commit a felony involving force or violence; using or about to use unlawful deadly physical force; or imminently endangering the person's life or imminently about to victimize the person from the continuation of a pattern of domestic abuse. Ark. Code Ann. § 5-2-607(a) (Supp. 2019). A person may not use deadly force in self-defense if the person knows he or she can avoid the necessity of using deadly force by retreating or, with complete safety, by surrendering possession of property to person claiming a lawful right to possession of the property. Ark. Code Ann. § 5-2-607(b)(1)(A) & (2). However, a person is not required to retreat if the person is unable to retreat with complete safety; if the person is in the person's dwelling and was not the original aggressor; or if the person is a law enforcement officer or a person assisting at the direction of a law enforcement officer. Ark. Code Ann. § 5-2-607(b)(1)(B)(i)–(iii); *Bailey v. State*, 2021 Ark. App. 38, 615 S.W.3d 763. A person is justified if he can show the victim was the aggressor and the accused used all reasonable means within his power and consistent with his safety to avoid the use of deadly force; critical to this inquiry is the reasonableness of the accused's apprehension that he was in danger of death or great bodily harm. *Id.*

Appellant argues on appeal that the State failed to negate his justification defense. He claims that he gave a clear statement to law enforcement that he shot Brandon in self-defense and that the State did not present any direct evidence to support any conclusion other than that appellant acted in self-defense. Appellant further argues that any

13

circumstantial evidence of his guilt was not "of sufficient force to exclude the reasonable explanation for [his] actions—that he was traumatized and scared." As such, appellant argues that the jury had to resort to speculation and conjecture in order to find him guilty. We disagree.

The jury heard appellant's version of events from the video recording of his custodial statement. Appellant told law enforcement that Brandon had pulled a gun from his waistband and that Brandon was shot in the chest after a struggle. Appellant explained that he told Brandon to go to the hospital and that Brandon "flop[ped] out" on the porch and just lay there. Appellant admitted that he later moved Brandon back in the home and said that he did not see any blood. However, the State offered evidence that contradicted and was inconsistent with appellant's version of events. For example, the State offered evidence to show that the gun was not owned by Brandon as appellant contended but rather had been purchased years earlier in Pueblo, Colorado, where appellant resided at the time of the purchase. Ms. Simpson testified that Brandon did not own a gun. She also explained that when she had tried to approach Brandon, Brandon had warned her that appellant had a gun and instructed her to run and get help. Additionally, the evidence also indicated that when Brandon left the Tahoe to enter appellant's residence, Ms. Simpson remained in the Tahoe with the engine running. Ms. Simpson testified that when she left the Tahoe to aid her husband after he had been shot, the Tahoe was running. She did not return to the Tahoe; rather, she ran up the hill and called 911. However, several minutes later, when Officer Dillon arrived on the scene, he inspected the Tahoe and testified that the Tahoe was not

14

running. Ashona Givens testified that after she saw a man (Brandon) collapse on the porch, she saw a woman open the door, look out, and shut the door. Later, Ms. Givens saw the woman open the door again, but this time there was a guy with her. Ms. Givens explained that she saw the guy pick up the collapsed man "by his underarms and [drag] him in the house like he was trash." They closed the door and then the woman opened the door again, looked out, and then closed the door. Miranda Dollar, a crime-scene specialist with the Little Rock Police Department crime-scene search unit, testified that the keys to the red Tahoe were found inside the residence on the coffee table, which supports the reasonable inference that appellant or his fiancée removed the keys from the Tahoe after Ms. Simpson left the scene and before police arrived. Additionally, after the shooting, no one answered the door to the home, and law enforcement was not able to enter the home until approximately two hours after Brandon had been shot. Even then, appellant could not be found. Instead, law enforcement found Brandon dead in the bedroom, and Ms. Krasovic was taking a shower in the bathroom. The gun had been hidden in a box of detergent under the bathroom vanity. Instead of calling for help to get Brandon medical attention, appellant had fled. Our appellate courts have consistently held that flight is probative evidence of guilt. *Gentry*, *supra*; *Gillard*, *supra*. Appellant acknowledged to law enforcement that he had left the apartment after the shooting, but he offered no explanation as to where he went. On appeal, appellant claims his action of fleeing was not evidence of his guilt but, rather, was reasonable because he was "traumatized and scared." In conclusion, the jury was free to believe all or part of appellant's explanation or to believe the State's version of the facts.

15

*Gentry, supra.* Thus, viewing the evidence in the light most favorable to the State, we hold that substantial evidence supports the verdict and affirm.

### III. *Lindsey Krasovic's Out-of-Court Statements*

Next, appellant argues that the circuit court erred in refusing to admit the recording of Lindsey Krasovic's statements made to law enforcement during an interview regarding this incident to be played for the jury. In a pretrial motion in limine and a supplemental motion in limine, appellant sought to introduce the following statements made by Ms. Krasovic:

- The portion of Lindsey Krasovic's interview in which she discussed telling the appellant that someone was attempting to break into the residence.

- The portion of Lindsey Krasovic's interview in which she discussed telling the appellant that Brandon Simpson was the individual who had attempted to break into the residence prior to the appellant's arrival.

- The portion of Lindsey Krasovic's interview in which she discussed the appellant's telling Brandon Simpson that he needed to leave the residence.

- The portion of Lindsey 'Krasovic's statement in which she tells detectives that Brandon Simpson was initially in possession of the firearm.

- The portion of Lindsey Krasovic's interview in which she discussed Brandon Simpson stating that "he was gonna kill us both and burn the place down."

- The portion of Lindsey Krasovic's interview in which she discussed telling the appellant that he needed to leave the residence and that she would take Brandon Simpson to the hospital.

Ms. Krasovic had been charged with hindering apprehension or prosecution and possession of a firearm by a felon, and it was therefore anticipated that she would invoke her Fifth Amendment right and refuse to testify in appellant's trial. In his original motion in limine, appellant asserted that he wanted to introduce the partial statements to show their effect on him as the listener and to show the basis for his actions as well as to show their

16

effect on law enforcement. In the supplemental motion in limine, appellant argued that the statements were not hearsay because they were not being offered for the truth of the matter asserted but were "independently relevant because [they tended] to show that the Little Rock Police Department was biased against the Defendant and failed to take appropriate investigatory action in light of information it or the police officers had received." Appellant asserted that because statements are admissible to show an officer's action in a criminal case, they should also be admissible in this case to show law enforcement's inaction. Specifically, appellant contended that law enforcement had reason to believe that Brandon was the initial aggressor, but law enforcement failed to take any action to corroborate or refute his and Ms. Krasovic's version of events, such as by obtaining a search warrant to search Brandon's residence.

During oral argument regarding the motions, the State noted that some of the information that Ms. Krasovic detailed in her statements would also be admitted through statements that appellant made in his interview with law enforcement. Therefore, the State argued, regardless of the court's ruling, much of the information was cumulative. Appellant argued that the evidence may be cumulative, but that should not preclude the evidence from being admitted. Appellant explained that he ordinarily would be able to call Ms. Krasovic as a witness to ask her about who was the initial aggressor and who brought the gun to the residence as impeachment if law enforcement testified that the "only information that they had that would suggest that that was how things unfolded came from the defendant." The

State responded that this was not the basis alleged in the motion. Thereafter, appellant clarified his argument and stated the following:

> the whole point is that . . . Ms. Krasovic told them this information, yet they failed to take any action upon that information. And that's critically relevant because if it's characterized as the only information that they had that Mr. Simpson was the initial aggressor came from the defendant, that's simply not the case, Judge. And that's the basis for my motion.

The circuit court ultimately ruled that appellant could ask law enforcement whether a search of the home was conducted; however, the circuit court stated the following in its ruling:

> [T]he out-of-court statements of Lindsey Krasovic are not admissible. I do believe that we get into some hearsay on hearsay at some portions of time. And that in certain instances I do believe that this is a backhanded way of trying to get in statements that are truly being offered for the truth of the matter asserted, not for the purpose – not for any other purpose. Because as [the State] has stated, many of these statements are coming in from Mr. Severance's statement. And you can question the police as to whether or not they conducted the search warrants of the victim's home to look for the ammunition.

Hearsay evidence is generally inadmissible except as provided by law or by the rules of evidence. Ark. R. Evid. 802; *Bragg v. State*, 328 Ark. 613, 946 S.W.2d 654 (1997). Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Ark. R. Evid. 801(c). With respect to an out-of-court statement, however, our appellate courts have held that it is not hearsay under Rule 801(c), where the statement is offered to show the basis for the witness's actions. *Dednam v. State*, 360 Ark. 240, 200 S.W.3d 875 (2005). "[H]earsay included within hearsay is not excluded . . . if each part of the combined statements conforms with an

exception . . . provided in th[e] rules." Ark. R. Evid. 805. In other words, to be admissible, each level of hearsay must conform to an exception of the hearsay rule. *Cook v. State*, 350 Ark. 398, 86 S.W.3d 916 (2002). The decision to admit or exclude evidence is within the sound discretion of the circuit court, and we will not reverse that decision absent a manifest abuse of discretion. *Scamardo v. State*, 2013 Ark. 163, 426 S.W.3d 900. An abuse of discretion is a high threshold that does not simply require error in the circuit court's decision but requires that the circuit court act improvidently, thoughtlessly, or without due consideration. *Id.* Additionally, this court will not reverse an evidentiary ruling absent a showing of prejudice. *Id.*

On appeal, appellant argues as he did below that Ms. Krasovic's statements were "admissible to show the action or inaction by law enforcement."[5] It is true that our appellate courts have repeatedly held that out-of-court statements are not hearsay if offered to show the basis of an officer's action. *Dednam*, *supra*; *Bragg*, *supra*. However, that is not the case here. Law enforcement did not act on Ms. Krasovic's statements. Instead, appellant attempted to have Ms. Krasovic's out-of-court statements admitted to corroborate his version of events so that he could argue to the jury that law enforcement *should have* used the

_____

[5]To the extent that appellant attempts to expand his argument on appeal to include that the statements were also admissible to show the "basis of appellant's actions or his state of mind" or to "establish appellant's motivations," we do not consider these arguments. As noted above, appellant clarified during oral argument that the basis for his motion was that the statements were admissible to show law enforcement's inaction despite Ms. Krasovic corroborating appellant's version of events. It is well settled that a party is bound by the nature and scope of the objections and arguments made at trial and may not enlarge or change those grounds on appeal. *Fields v. State*, 2023 Ark. App. 321, 669 S.W.3d 277.

19

statements as a basis for action—specifically, that law enforcement *should have* searched Brandon's home. The State correctly notes that none of the cases cited by appellant permit hearsay evidence to be admitted on this basis. Thus, on these facts, we cannot hold that the circuit court abused its discretion in excluding these hearsay statements.

IV. *Batson Challenge*

Appellant's final argument on appeal is that the circuit court erred in granting the State's *Batson* challenge to a potential juror that appellant had sought to strike. The Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States "prohibits all forms of purposeful racial discrimination in selection of jurors." *Batson v. Kentucky*, 476 U.S. 79, 88 (1986). In *MacKintrush*, the Arkansas Supreme Court set forth the following three-step process to be followed in challenges under *Batson*:

*Step One. Prima facie case.*

The strike's opponent must present facts, at this initial step, to raise an inference of purposeful discrimination. According to the *Batson* decision, that is done by showing (1) that the strike's opponent is a member of an identifiable racial group, (2) that the strike is part of a jury-selection process or pattern designed to discriminate, and (3) that the strike was used to exclude jurors because of their race. In deciding whether a *prima facie* case has been made, the trial court should consider all relevant circumstances. Should the trial court determine that a *prima facie* case has been made, the inquiry proceeds to Step Two. However, if the determination by the trial court is to the contrary, that ends the inquiry.

*Step Two. Racially neutral explanation.*

Assuming the strike's opponent has made a *prima facie* case, the burden of producing a racially neutral explanation shifts to the proponent of the strike. (But, again, the burden of persuading the trial court that a *Batson* violation of purposeful discrimination has occurred never leaves the strike's opponent.) This explanation, according to *Batson*, must be more than a mere denial of discrimination or an

20

assertion that a shared race would render the challenged juror partial to the one opposing the challenge. Under *Purkett*, this explanation need not be persuasive or even plausible. Indeed, it may be silly or superstitious. The reason will be deemed race neutral "[u]nless a discriminatory intent is inherent in the prosecutor's explanation." *Purkett* [*v. Elem*], 514 U.S. [765,] 768 [(1995)]. But, according to *Purkett*, a trial court must not end the *Batson* inquiry at this stage, and, indeed, it is error to do so.

*Step Three. Trial court decision on purposeful discrimination.*

If a race-neutral explanation is given, the trial court must then decide whether the strike's opponent has proven purposeful discrimination. *Purkett v. Elem*, *supra*. Though the United States Supreme Court has not elucidated precisely what is required at this step, clearly the strike's opponent must persuade the trial court that the expressed motive of the striking party is not genuine but, rather, is the product of discriminatory intent. This may be in the form of mere argument or other proof that is relevant to the inquiry. But it is crucial that the trial court weigh and assess what has been presented to it to decide whether in light of all the circumstances, the proponent's explanation is or is not pretextual. If the strike's opponent chooses to present no additional argument or proof but simply to rely on the prima facie case presented, then the trial court has no alternative but to make its decision based on what has been presented to it, including an assessment of credibility. We emphasize that following step two, it is incumbent upon the strike's opponent to present additional evidence or argument, if the matter is to proceed further.

*MacKintrush v. State*, 334 Ark. 390, 398–99, 978 S.W.2d 293, 296–97 (1998) (footnotes omitted); *see Turnbo v. State*, 2021 Ark. 166, 629 S.W.3d 797; *Taylor v. State*, 2022 Ark. App. 296; *cf. Davis v. State*, 2019 Ark. App. 303, 577 S.W.3d 714.

On appeal, a circuit court's ruling on a *Batson* challenge is reversed only when the circuit court's findings of fact are clearly against the preponderance of the evidence. *Holder v. State*, 354 Ark. 364, 124 S.W.3d 439 (2003). In making *Batson* rulings, an appellate court accords some measure of deference to the circuit court since the circuit court is in a superior

21

position to make the determinations because it has the opportunity to observe the parties and jurors and determine their credibility. *Id.*

During jury selection, appellant sought to exercise six peremptory strikes, and the State did not seek to exercise any. To repeat, the victim, Brandon Simpson, was African American, and appellant, Scott Severance, is Caucasian. There were three African American jurors on the jury panel. During voir dire, appellant attempted to strike all three of these jurors. The State objected and argued that because defense counsel sought to strike all the potential African American jurors in the first trial and again sought to do so in the second trial, the circuit court should require defense counsel to provide a race-neutral reason for the strikes. The circuit court agreed with the State and asked defense counsel to provide his reasons for exercising those three peremptory strikes against the potential African American jurors. Regarding one of the potential jurors, defense counsel's reasons included that the juror chose to wear a COVID-19 mask, had a close family friend in law enforcement, and was not a gun owner. The circuit court overruled the State's objection and allowed the defense to strike this juror. The defense argued that the second juror also wore a COVID-19 mask and seemed quiet and disengaged. The circuit court overruled the State's objection, and defense counsel was able to strike the second potential juror.

Regarding the third juror, the circuit court sustained the State's *Batson* challenge, and that objection is the subject of this third point on appeal. After a very lengthy discussion between the parties and the court, defense counsel explained that he wanted to strike this third potential juror because she was a non-gun owner. The defense explained that he would

22

try to strike non-gun owners in cases in which a defendant was arguing self-defense because he felt that non-gun owners are less "receptive to self-defense or using deadly force with a gun." Defense counsel did acknowledge that there were also six other potential jurors who had raised their hands stating that they were non-gun owners. In response, the State acknowledged that the circuit court was "in a difficult position in trying to determine the veracity or . . . the truthfulness of whether or not that is the basis for the strike." It argued that there were other jurors who were not African-American and answered that they did not own a gun; yet, defense counsel did not attempt to strike them despite, having a total of eight peremptory strikes he could have used. The State further pointed out that this was the second time defense counsel had attempted strike all potential African American jurors. Thereafter, the circuit court provided the following oral ruling:

> I do not believe that there are race neutral reasons for striking [third potential juror], especially in light of the fact that there are other similarly situated non-African-American jurors who answered questions identically to [third potential juror]. However, they were not struck. And so therefore, I'm going to uphold the Batson challenge for [third potential juror] and not strike her.

Appellant argues on appeal that "the circuit court never arrived at step three" and argues that the circuit court's finding "was clearly against the preponderance of the evidence" because defense counsel offered a race-neutral reason for striking the third potential juror. He explains that defense counsel made it clear that "appellant sought to seat gun owners on the jury, which is clearly a race-neutral reason."[6] Citing *Weston v. State*, 366 Ark. 265, 271,

---

[6]We acknowledge that appellant at one point in his brief states, "*Along with other reasons*, the primary basis of his strike as to the juror the court refused to excuse was that she

23

234 S.W.3d 848, 853 (2006), appellant notes that a race-neutral reason does not need to be "persuasive or even plausible" and that it may even be considered "silly or superstitious."[7]

Here, despite any assertion otherwise, the circuit court did in, fact, follow all three steps in the analysis of the State's *Batson* challenge. Once the party striking a juror offers a race-neutral explanation and the court rules on the ultimate issue of intentional discrimination, the preliminary issue of whether a prima facie case was shown becomes moot. *Johnson v. State*, 2010 Ark. App. 700.; *id.* Although it is true that the reasons offered in the second step do not necessarily need to be rational as long as they are race neutral, the third step requires a circuit court to decide whether to credit the race-neutral reasons or to reject them as pretextual. *See Turnbo v. State*, 2021 Ark. 166, 629 S.W.3d 797.

In *Jackson v. State*, 375 Ark. 321, 290 S.W.3d 574 (2009), we affirmed the circuit court's acceptance of the State's race-neutral reason for using a peremptory strike when the State struck every juror—not just the African American ones—who expressed their reservations about the death penalty. In this case, however, it is undisputed that several jurors stated that they did not own guns, and defense counsel did not attempt to strike these

---

was not a gun owner." (Emphasis added.) However, appellant does not present or develop any further argument regarding these alleged "other reasons" on appeal. Our appellate courts have repeatedly held that we will not research or develop arguments for appellants. *Jenkins v. State*, 2019 Ark. App. 419, at 12, 582 S.W.3d 32, 39.

[7]The State suggests that our appellate record is insufficient to review this issue because the juror names have been redacted. Therefore, the State asks us to summarily affirm since it is appellant's burden to bring up a sufficient record. We disagree. Even though the juror's name has been redacted, knowing her specific name is unnecessary to our analysis.

24

jurors, despite having additional peremptory strikes remaining. For these reasons, and as quoted above, the circuit court orally ruled that it was rejecting the race-neutral reason offered by defense counsel. Thus, the circuit court followed the required steps in the *Batson* analysis, and we cannot say that the circuit court's determination was clearly against the preponderance of the evidence. Accordingly, we must affirm.

Affirmed.

HARRISON, C.J., and ABRAMSON, J., agree.

*Robert M. "Robby" Golden*, for appellant.

*Tim Griffin*, Att'y Gen., by: *Karen Virginia Wallace*, Ass't Att'y Gen., for appellee.