Cite as 2025 Ark. App. 609

# ARKANSAS COURT OF APPEALS

DIVISION III
No. CR-24-832

| | |
|---|---|
| EMILY KATE-MARIE BROWN<br><br>APPELLANT<br><br>V.<br><br>STATE OF ARKANSAS<br><br>APPELLEE | Opinion Delivered December 10, 2025<br><br>APPEAL FROM THE CLEVELAND COUNTY CIRCUIT COURT [NO. 13CR-22-55]<br><br>HONORABLE DAVID W. TALLEY, JR., JUDGE<br><br>AFFIRMED |

**MIKE MURPHY, Judge**

Appellant Emily Brown appeals her conviction by a Cleveland County jury of the first-degree murder of her ex-boyfriend, Christopher Miller. On appeal, she argues that the State did not negate her justification defense with substantial evidence and that the circuit court erred in admitting a portion of her custodial interview into evidence. We affirm.

At trial, the State presented the following evidence. On August 6, 2022, Miller and his stepfather, Frelon Newsom, were traveling from Newsom's home in Alabama, where Miller was staying while recovering from Rocky Mountain Spotted Fever, to Arkansas so that Miller could visit the son he shared with Brown. Miller was staying with his mother and stepfather following a two-week hospitalization, which included a period of time in a

medically induced coma. Newsom was driving because Miller was, in Newsom's words, "still swirly headed, . . . he couldn't be up over five or six minutes . . . because he'd fall down."

Newsom testified that when they arrived at Brown's father's house, Newsom got out of the car to stretch his back and visit with Brown's father while Miller went around to the back of the house where Brown was waiting for him. Newsom said that, moments later,

> I heard two gunshots go off and I heard my son holler, "Daddy, help," and then I seen my son fall out from behind the house. . . . And then she walked over right over the top of him and shot some more into him. . . .I saw her put some more bullets in him, swap hands with the gun and reach down and feel for his pulse to make sure he was dead[.]

Dr. Stephen Erickson performed Miller's autopsy. Dr. Erickson testified that Miller sustained six gunshot wounds. The shots were labeled one through six for the purposes of the autopsy, but Dr. Erickson testified that he could not tell in what order the shots were fired or which shot killed Miller. Gunshot one entered Miller's left pinky and exited his thumb. Gunshot two entered the right side of Miller's chest, traveling right to left, downward, and front to back. This shot went through Miller's lung and liver, ultimately lodging in his spinal column. Gunshot three traveled left to right, slightly front to back and downward. It hit Miller's spinal column and destroyed his spinal cord and would have paralyzed him from his navel down.

Shots three, four, five, and six appeared to be related because they each traveled in the same direction and hit Miller's body within eight or ten inches of each other on the left side of Miller's chest. Dr. Erickson testified that the grouping of shots four, five, and six were a sign that either the shots were fired in quick succession or Miller was not moving when

2

they were fired. Dr. Erickson could not conclusively say from how far away the shots were fired on the basis of his exam, but it was likely more than three feet. Two of the gunshots traveled at downward angles.

Chief Deputy Gary Young with the Cleveland County Sheriff's Office was the lead investigator on Brown's case. He interviewed Brown at the sheriff's office on the night of August 6, 2022. In that interview, Brown stated that she had been in an abusive relationship with Miller, and they had been separated for around a year and a half. When she started dating someone new, Miller would send her and her boyfriend hateful messages. On one occasion, Miller "stalked" her and her boyfriend when they went to the store, prompting her to seek an order of protection against Miller. She had trouble getting Miller served with the order, though, so she told him he could come get his son with the intention of never letting him see his son; instead, she intended to serve him with the order of protection.

Brown said she "started the plan" that morning when she went into town and stopped at the sheriff's office. She told the dispatcher "what was going on" and was told that if Miller showed up, let them know so they could get a deputy over to serve the protective order. She was advised by Sheriff Jack Rogers that if Miller showed up, she should stay inside the house, lock the door, and contact the sheriff's office.

When Miller arrived, she told him she had to go inside to get their son's bag. She went inside, put some clothes in a Dollar Store bag, and called the sheriff's office. When Brown went back outside, she handed Miller the bag, smiled at him, and told him he was going to have to stay there because law enforcement was coming to serve him.

3

She claimed that at that point, he took a step forward and threatened to kill her, so she pulled her gun out and shot him. She claimed she was backing up while she shot and that she did not shoot him after he was already on the ground. She also claimed he was moving forward for the first few shots, but he eventually moved backward and hit the ground. She estimated that she shot him one or two times while he was moving backward.

Deputy Young and Lieutenant Oscar Gerard conducted a second interview of Brown on August 8, 2022. During the second interview, Lieutenant Gerard questioned Brown about the shell casings and blood trail at the scene of the shooting. Before trial, Brown had moved to exclude the following statements made by Lieutenant Gerard for lack of foundation:

> Here's the, here's the, have a seat, Katy. Here's the issue: Okay. And I'm just gonna tell you what the scene shows. Okay? The shell casing starts at the truck door and they work their way to the actual body. Okay? There is a blood trail, seven foot. Okay? From him, where it starts to where he landed, he fell back seven feet. He did. Okay? You follow me? So with that being said, where he ended up is not where he was shot initially, so the first shell casing that I find is three foot from his left arm. Actually, it's closer than that, because I measured [from the] center mass of his body. That shell casing is under three foot from his left arm, so that would indicate to me that shot was fired after he was down in that final resting place. How did that casing get there?

The court denied the motion to exclude the portion of the interview but did agree that, unless a foundation was laid, Lieutenant Gerard would not be allowed to offer opinion testimony on the matter during direct examination. The court also ruled that Brown could offer a limiting instruction to inform the jury that the purpose of interrogation of a witness is to elicit information. Brown objected to Lieutenant Gerard's testimony about the shell casings and the blood trail but did not offer any limiting instruction when the interview was

4

entered into evidence and played for the jury. On direct, Gerard testified that there was about a seven-foot trail of blood leading to and away from Miller's body. He also detailed where each of the shell casings was found, with one being about three feet away from Miller's body.

After the State rested, Brown moved for a directed verdict, arguing that the evidence demonstrated that she was justified in using deadly force against Miller due to the continuing pattern of domestic abuse along with his threats to kill her while he came at her. She also argued that the only evidence offered by the State to negate her self-defense claim was Newsom's testimony, which she argued was contradicted by Dr. Erickson's report and testimony that there was no close-range fire. The court denied the motion for a directed verdict, reasoning that the evidence left room for doubt about whether Brown was afraid of Miller. It also noted that Newsom's testimony was not incompatible with Dr. Erickson's findings.

Kimberly Poupore and Karen King testified on Brown's behalf. They both worked at a dentist's office where Brown was a patient and testified that they had concerns that Brown was a victim of domestic violence based on their observations of Brown's injuries and their records.

Brown testified on her own behalf. She and Miller started dating in May 2015, and they moved in together two months later. Miller hit her for the first time in August 2015. Brown then went on to provide an extensive account of the physical and sexual violence she experienced by Miller. She detailed multiple instances of rape, injuries like black eyes and a

5

broken nose, and how he would lock her in a room. He kept her driver's license, debit card, and Social Security card in his wallet.

She left Miller in February 2021 and began dating someone else in May 2022. Brown said that Miller's behavior escalated when he found out she was dating, including stalking her and her boyfriend and confronting them at a Walmart in June 2022. This led her to seek a protective order against Miller on July 28, 2022. When she came to Arkansas on August 5, 2022, she went to the sheriff's office to see about getting the protective order served; she had devised a plan to tell Miller she would let him see his son, but her real intention was to get him served.

Brown testified that Miller was angry and "flustered" as soon as she saw him on August 6. She told him their son was with a babysitter, and she needed to go inside to get clothes and call the babysitter to bring their son back. Brown went inside the house and called the sheriff's office to tell them Miller had arrived. When she went back out, she tossed the bag to Miller because she "was staying out of reach of him." She told him the babysitter was on her way so there would be time for law enforcement to arrive. During the conversation Miller apparently asked her why she was smirking, and Brown told him law enforcement was on its way.

Brown testified that Miller then told her, "I'm going to kill you, you stupid fucking bitch," and started walking toward her. Brown said she stepped backward, drew her gun, and started firing rapidly while walking backward. He took a few more steps toward her while she was shooting him, but just before the gun was empty, he stumbled back. By the time he hit

the ground, the gun was empty. As she walked toward him, she dropped the gun. When she got to him, she dropped to her knees and screamed. She claimed that Newsom saw her at the point when she was on her knees next to Miller. She attempted to render first aid to Miller by applying pressure to his wounds and performing CPR.

Brown rested and renewed her motion for directed verdict, reiterating her previous argument. The State also moved for a directed verdict on the justification defense, arguing that Brown provoked Miller and therefore had a duty to retreat. The court denied both motions.

Brown was convicted of first-degree murder and sentenced to thirty five years in the Arkansas Division of Correction. She appealed. On appeal, she argues that (1) the State did not present sufficient evidence to negate her justification defense, and (2) the court committed reversible error in allowing the entirety of her second recorded interview into evidence and not excluding the portion in which Lieutenant Gerard made inferences based on the position of blood trails and shell casings.

Brown's first argument concerns the sufficiency of the evidence. Brown's position was that she was acting in self-defense when she shot Miller, and once a justification defense is asserted, it becomes an element of the offense that the State must disprove. *Severance v. State*, 2024 Ark. App. 87, at 10–11, 684 S.W.3d 610, 618. In other words, it was the State's burden to negate that defense beyond a reasonable doubt. Ark. Code Ann. § 5-1-102(5)(C) (Supp. 2021). Brown argues that the State did not sufficiently negate her defense that she was justified in her actions because of the continuation of a pattern of domestic abuse.

Arkansas Code Annotated section 5-2-607(a)(3) (Supp. 2021) provides that a person is justified in using deadly physical force against another person if she reasonably believes that the other person is imminently endangering her life or about to victimize her from the continuation of a pattern of domestic abuse.

In reviewing a sufficiency challenge, we view evidence in the light most favorable to the State and consider only evidence supporting the verdict. *Severance*, 2024 Ark. App. 87, at 10–11, 684 S.W.3d at 618. A conviction is affirmed if substantial evidence exists to support it. *Id.* Substantial evidence is evidence of sufficient force and character that it will, with reasonable certainty, compel a conclusion without resorting to speculation or conjecture. *Id.* Circumstantial evidence may provide a basis to support a conviction, but it must be consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. *Id.* Whether the evidence excludes every other hypothesis is for the jury to decide. *Id.* Likewise, the credibility of witnesses is an issue for the jury; it is free to believe all, part, or none of any testimonial evidence and may resolve questions of conflicting testimony and inconsistent evidence. *Id.*

But whether Brown was abused is not the end of the inquiry. Without question, Brown presented extensive evidence of a continuing pattern of domestic abuse, and the State did not contest Brown's account that she had been mistreated by Miller in the past. However, the existence of abuse does not, by itself, justify the use of deadly force. The focus of Brown's argument on appeal is that there was a history of domestic violence, but it ignores the other elements of the defense, which is whether she reasonably believed that deadly force was

immediately necessary to prevent imminent harm. The jury was entitled to find, on the basis of the physical evidence and eyewitness testimony, that she did not.

Circumstantial evidence presented by the State undermined Brown's contention that she was facing an imminent threat when she shot Miller. The jury heard testimony that Brown arranged for Miller—who was so weak from his recent illness that he could not stand for more than five minutes and could not drive himself—to come to Arkansas under false pretenses. Newsom testified that he heard two shots fired; heard Miller cry for help; saw Miller fall down; and saw Brown walk over to Miller, stand over him, and fire more rounds into his body after he was down. Consistent with Newsom's account, investigators recovered a shell casing within three feet of Miller's body, and the medical examiner testified that several wounds indicated bullets entered Miller's body from above at downward angles.

Justification for deadly force ends when the threat of endangerment or victimization of abuse is no longer imminent. Arkansas Code Ann. § 5-2-607(a)(3). The State presented evidence from which the jury could reasonably infer that any threat to Brown had ended before, at a minimum, the final shots were fired.

Brown argues that Newsom's testimony that she stood over Miller and continued to fire after Miller had fallen was contradicted by the medical examiner's opinion that the gunshots were not fired from close range. But these accounts are not necessarily irreconcilable. Dr. Erickson testified only that the wounds lacked the characteristics of shots fired from within approximately three feet; his testimony did not exclude the possibility that the shots were fired from a slightly greater distance while Miller was on the ground.

Accordingly, the State presented evidence sufficient to rebut Brown's justification defense.

Brown next argues that the circuit court erred when it allowed the jury to hear the portion of her second interview with Deputy Gerard during which he explained his inferences because of where the shell casings were located in an attempt to coax more information from Brown. At trial, the court agreed with Brown that Gerard could not testify concerning any conclusions (lay opinions) he made from the location of the shell casings and blood trail so that the jury could reach its own conclusions with the information provided. (Gerard concluded that, because of where the blood splatters and shell casings were, Brown must have shot Miller once he was already down or backing away.)

Nevertheless, the jury did ultimately hear some of those same conclusions when a portion of Brown's custodial interview with Gerard was played.

Evidentiary rulings are reviewed for abuse of discretion. *E.g.*, *Hopkins v. State*, 2017 Ark. App. 273, at 2, 522 S.W.3d 142, 144. Abuse of discretion is a high threshold that does not simply require error in the circuit court's decision but requires that the circuit court act improvidently, thoughtlessly, or without due consideration. *E.g.*, *id.* at 3, 522 S.W.3d at 144. Even if a circuit court does abuse its discretion in admitting evidence, the decision is still subject to a harmless-error analysis, meaning the appellant must demonstrate that the improperly admitted evidence is also prejudicial. *Romick v. State*, 2025 Ark. 57, at 10, 709 S.W.3d 816, 823 (overruling *Vasquez v. State*, 2022 Ark. App. 328, at 7–8, 652 S.W.3d 586, 590).

10

Brown cites *Vasquez* for the proposition that the error here was an abuse of discretion and prejudicial because the testimony ultimately affected her credibility with the jury; but *Romick* explains that lay witnesses are not required to check their knowledge, training, and experience at the courthouse doors, and they may testify to their opinions. *Romick*, 2025 Ark. 57, at 11, 709 S.W.3d at 824.[1] Moreover, even if the evidence here was admitted in error, we cannot say that it was prejudicial. Prejudice is not assumed from evidentiary errors. Here, the circuit court offered a limiting instruction regarding Gerard's recorded statements in the interview. It is well settled that an admonition to the jury usually cures a prejudicial statement unless it is so patently inflammatory that justice could not be served by continuing the trial. *Butler v. State*, 2024 Ark. App. 555, at 12. If the possible prejudice could have been cured by an admonition to the jury, the supreme court has found no abuse of discretion when defense counsel has refused the circuit court's offer of such a curative instruction. *Id.* Brown's failure to pursue curative measures after invitation to do so precludes reversal on this point. *Id.*

Affirmed.

GLADWIN and HIXSON, JJ., agree.

*Ogles Law Firm, P.A.*, by: *John Ogles*, for appellant.

*Tim Griffin*, Att'y Gen., by: *James Hill*, Ass't Att'y Gen., for appellee.

---

[1]We do not fault Brown's counsel for arguing *Vasquez*. It was a well-made point with law that was still in effect when the initial brief was filed.